**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**


KIM WITHROW,


          Plaintiff,


v.                                     CIVIL ACTION NO.  2:10-cv-00993


SEDGWICK CLAIMS MANAGEMENT SERVICE, INC.,


          Defendant.


**MEMORANDUM OPINION AND ORDER**


Pending before the court are the Motion by Sedgwick Claims Management Services, Inc. for Summary Judgment [Docket 148], the Plaintiffs' Motion for Summary Judgment [Docket 150], and the Plaintiffs' Motion for Conditional Certification and Court-Authorized Notice Pursuant to Section 216(b) of the FLSA [Docket 157].  For the reasons discussed below, the defendant's Motion for Summary Judgment is **GRANTED**, the plaintiffs' Motion for Summary Judgment is **DENIED**, and the Plaintiffs' Motion for Conditional Certification is **DENIED as moot**.

**I.     Introduction**

The central issue in this suit is whether the defendant, Sedgwick Claims Management Services, Inc. ("Sedgwick"), violated the Fair Labor Standards Act ("FLSA") by failing to pay

the plaintiffs time and a half for hours worked in excess of forty per week. Sedgwick contends that the positions held by the plaintiffs Kim Withrow, Teresa Clark, Jacqueline S. Cunningham, Journey Webb, Angela Adkins, Connie Griffith, Patricia McCormick, and Priscilla White fell within the administrative exemption to the overtime requirement.[1]  29 U.S.C. § 213(a)(1).  The plaintiff Paula Ball, according to Sedgwick, was a professional employee and was therefore exempt under 29 U.S.C. § 213(a)(1).

Sedgwick is a third-party administrator of workers' compensation and other insurance claims.  At its Charleston, West Virginia office, it administers 17,000 workers' compensation claims funded by the State of West Virginia.  These claims all arose prior to July 1, 2005, and are termed "old-fund" claims.[2]  The plaintiffs, with the exception of Paula Ball, were Claims Examiners II and Claims Examiners III.  As Claims Examiners, they managed workers' compensation claims.  Their duties included: (1) maintaining contact with the claimants; (2) processing requests for treatment and medication; (3) assisting in the settlement of claims; (4) setting and reevaluating the reserve for each claim; and (4) managing litigation.  Each Claims Examiner II and Claims Examiner III is assigned to approximately 180 to 190 claims, and the Claims Examiners generally perform the same duties.  However, Claims Examiners III are assigned to more complex cases than Claims Examiners II, and they are paid more.  The plaintiff Paula Ball was employed by Sedgwick as a utilization review nurse and also assumed duties as a telephonic case manager.

After outlining the procedural history of this suit and the summary judgment standard, I examine the FLSA's framework for determining whether an employee is subject to the

---

[1] Because this suit has not been certified as a collective action, the defendant must prove that each plaintiff's duties fell within the administrative exemption.  I discuss the plaintiffs' duties collectively to avoid repetitiveness, keeping in mind that the defendant's burden applies to each individually.

[2] In 2005, West Virginia passed Senate Bill 1004, which abolished the Workers' Compensation Commission.  Now private insurers provide workers' compensation insurance.  West Virginia remains responsible for administering these old-fund claims.

administrative exemption.  Viewing the facts in the light most favorable to the plaintiffs, I **FIND** that there is no genuine issue of material fact and the defendant has proven by clear and convincing evidence that the Claims Examiners' duties fell within the administrative exemption. Then I apply the professional exemption's requirements to the duties of the plaintiff Paula Ball, and I **FIND** that there is no genuine issue of material fact and the defendant has proven by clear and convincing evidence that Ball's duties fell within the professional exemption.  Finally, the plaintiffs' claim under the West Virginia Wage Payment and Collection Act fails as a matter of law.  These holdings render the plaintiffs' Motion for Conditional Certification moot.

**II.     Procedural History**

Kim Withrow filed suit in the Circuit Court of Kanawha County, West Virginia on July 9, 2010.  She alleged that Sedgwick violated the West Virginia Wage Payment and Collection Act ("WVWPCA").  Withrow brought it as an individual action and sought to certify it as a class action under West Virginia Rule of Civil Procedure 23.  The defendant removed the case on August 6, 2010.  On October 28, 2010, Withrow filed an Amended Complaint, adding plaintiffs to the suit and maintaining her allegations under the WVWPCA.  The plaintiffs filed a Second Amended Complaint on July 29, 2011.  The Second Amended Complaint asserts that the defendant violated the FLSA and seeks to bring the suit as a collective action under 29 U.S.C. § 216(b).  On August 16, 2011, the defendant and the plaintiffs filed motions for summary judgment.  The defendant's motion applies to each plaintiff and all claims.  The plaintiffs' motion does not apply to the plaintiff Paula Ball.  On September 23, 2011, the plaintiffs filed a Motion for Conditional Certification and Court-Authorized Notice Pursuant to Section 216(b) of the FLSA.  These motions are now ripe for review.

The plaintiffs' Second Amended Complaint contains three counts: (1) an individual claim for violation of the FLSA for failing to pay the plaintiffs overtime; (2) a collective action claim for violation of the FLSA on behalf of the plaintiffs and those similarly situated; and (3) a claim for violation of the WVWPCA, individually and as a class action.

### III.     Summary Judgment Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position.  *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves-Humphreys Co.*, 818

F.2d 1126, 1128 (4th Cir. 1987); *Ross v. Comm'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds*, 490 U.S. 228 (1989).

## IV. The Fair Labor Standards Act and the Administrative Exemption

### a. Statutory and regulatory framework

The Fair Labor Standards Act requires that employees who work more than forty hours a week receive overtime compensation "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Employees "employed in a bona fide executive, administrative, or professional capacity" are exempt from this overtime requirement. 29 U.S.C. § 213(a)(1). Determining whether an employee is exempt is a mixed question of law and fact. *Harper v. Gov't Emps. Ins. Co.*, 754 F. Supp. 2d 461, 463 (E.D.N.Y. 2010). How an employee spends his time is a question of fact. *Id.* Whether an employee's duties render him subject to an exemption is a question of law. *Robinson-Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886, 891 (D.C. Cir. 2010). The employer bears the burden of proving by clear and convincing evidence that its employees fall within an exemption. *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 691 (4th Cir. 2009).

The Secretary of Labor has adopted regulations that require an individual to meet three criteria to be considered an administrative employee. The employee must be:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

There is no dispute that the plaintiffs were compensated more than $455 per week. Therefore, my analysis focuses on the second and third prongs of the administrative exemption test. The regulations provide that to perform work "directly related to the management or general business operations," "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). This includes "work in functional areas such as . . . insurance; . . . safety and health; personnel management; human resources; [and] employee benefits." 29 C.F.R. § 541.201(b). Moreover, an employee can qualify for the exemption if his or her primary duty is work directly related to the management or business operations of the employer's customers. 29 C.F.R. § 541.201(c). "Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt." *Id.*

Turning to the third prong, the exercise of discretion and independent judgment entails comparing and evaluating alternative courses of conduct and deciding on one after considering the possibilities. 29 C.F.R. § 541.202(a). Additionally, the term "matters of significance" means "the level of importance or consequence of the work performed." *Id.* There are many factors to consider in determining whether an employee's duties fulfill the third requirement, including "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;" "whether the employee has authority to commit the employer in matters that have significant financial impact;" "whether the employee has authority to negotiate and bind the company on significant matters;" and "whether the employee represents the

company in handling complaints, arbitrating disputes or resolving grievances."   29 C.F.R. § 541.202(b).

"The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision."   29 C.F.R. § 541.202(c).  However, it "does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review."   *Id.* Additionally, "[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action."   *Id.* A large number of employees who do the same work may still do work that involves discretion and independent judgment.   29 C.F.R. § 541.202(d).  Clerical or secretarial work, however, including "recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work," does not involve discretion and independent judgment.  29 C.F.R. § 541.202(e).

The regulations also provide examples of employees who qualify for the administrative exemption.  The first of those examples states:

> Insurance claims adjusters generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other type of company, if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation.

29 C.F.R. § 541.203(a).  Other examples include employees in the financial services industry, employees who lead a team of employees to complete major projects, human resources managers, and purchasing agents.  29 C.F.R. § 541.203(b), (c), (e), (f).

The Fourth Circuit most recently addressed the administrative exemption in *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688 (4th Cir. 2009).  The decision reversed the district court and held that racing officials employed at Charles Town Gaming, which operates a casino and horse racing facility, did not satisfy the requirements for the administrative exemption and were entitled to overtime.  *Id.* at 695.  These officials had a number of day-to-day duties, including completing the racing entries, observing the races, determining the outcome using a computer system, and identifying the horses.  *Id.* at 690.  The Fourth Circuit found that the district court improperly relied on the critical role of the racing officials in determining that their positions were directly related to the employer's general business operations.  *Id.* at 692. According to the Fourth Circuit, the inquiry should focus not on the indispensability of a position, but on the type of work performed by an employee.  *Id.* at 692-93.  The racing officials, the court noted, did not have supervisory responsibilities and they did not develop or evaluate Charles Town's business policies.  *Id.* at 694.  The court explained that a non-manufacturing employee can be a "production" employee when the employee's job is to generate the product or service that the business offers to the public.  *Id.* (citing *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9 (1st Cir. 1997)).  In *Desmond*, Charles Town produces live horse shows and the court found that the racing officials assisted in generating these shows and should be considered production employees.  *Id.*  Consequently, their positions were "unrelated to management or the general business functions of the company."  *Id.*

Insurance claims adjusters have been classified as exempt employees by several appellate courts.  *Robinson-Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886 (D.C. Cir. 2010); *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865 (7th Cir. 2008); *In re Farmers Ins. Exch.*, 466 F.3d 853 (9th Cir. 2006) (opinion amended and superseded on denial of rehearing by *In re Farmers Ins. Exch.,*

*Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119 (9th Cir. 2007)); *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578 (5th Cir. 2006); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997 (8th Cir. 2003). In *Robinson-Smith v. Government Employees Insurance Co.*, the Court of Appeals for the District of Columbia reversed the district court's grant of summary judgment in favor of the plaintiffs, auto damage adjusters employed by GEICO, and directed the district court to enter judgment in favor of GEICO. 590 F.3d at 897. The court explained that although auto damage adjusters spend a majority of their time appraising vehicles and estimating repair costs, they also negotiate and settle claims with repair shops and with insureds. *Id.* at 888. They have full authority to settle claims within their limits, which are $10,000 to $15,000, and can recommend a larger settlement to a supervisor. *Id.* at 895.

The only issue before the appellate court was whether GEICO satisfied the third prong by showing that the adjusters' primary duty included the exercise of discretion and independent judgment.[3]  *Id.* at 893. Although the parties disagreed on how much discretion the adjusters exercised, no one disputed that they exercised *some* discretion. *Id.* at 893-94. The court reasoned that the regulation requires that employees' primary duty include the exercise of discretion and independent judgment, but does not state how frequently discretion must be exercised. *Id.* at 894. The D.C. Circuit concluded that even if the "vast majority" of the adjusters' work was using their training and skills to determine the value of damage to vehicles, their primary duty included the exercise of discretion and independent judgment because they

---

[3] The DOL had a different test for the administrative exemption until 2004. The court in *Robinson-Smith* applied the "short test," which applied to employees making more than $250 per week. 590 F.3d at 892. That test states that an administrative employee is one: "who is compensated on a salary or fee basis at a rate of not less than $250 per week exclusive of board, lodging, or other facilities, and whose primary duty consists of either the performance of office or nonmanual work directly related to management policies or general business operations of the employer or the employer's customers . . . where the performance of such primary duty includes work requiring the exercise of discretion and independent judgment." *Cheatham v. Allstate Ins. Co.*, 465 F.3d at 584 n.6 (quoting 29 C.F.R. § 541.214). "The revisions were meant to 'consolidate and streamline' the old regulations and to be 'consistent with' the old short test." *Robinson-Smith*, 590 F.3d at 892 n.6. Therefore, cases analyzing the administrative exemption under the short test are still relevant.

were also involved in the negotiation and settlement of claims.  *Id.*  According to the court, the adjusters made independent choices "free from immediate direction or supervision" because they could settle claims within their limits of $10,000 or $15,000.  *Id.* at 895.  The fact that some adjusters routinely called their supervisors when they sought non-minor concessions did not change the court's analysis.  *Id.*  Finally, the court found that the adjusters made choices "with respect to matters of significance" because they could settle claims that bound GEICO financially.  *Id.* (quoting 29 C.F.R. § 541.207(a)).

### b.  Application

To prevail on summary judgment, Sedgwick must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law because it has proven by clear and convincing evidence that (1) the plaintiffs were compensated at least $455 per week; (2) their "primary duty [was] the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) their "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. §  541.200(a).  The parties agree that the plaintiffs earned more than $455 per week.  The plaintiffs contend, however, that the defendant has not met its burden of proof on the second and third parts of the administrative exemption test.

### i.  Second Prong: Was the plaintiffs' primary duty the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers?

It is uncontested that the plaintiffs performed non-manual office work.  The defendant asserts that the plaintiffs' administration of West Virginia workers' compensation claims was "directly related to [the] State of West Virginia's management policies or general business operations in the functional areas of insurance, safety and health, labor regulations, and legal and

regulatory compliance." (Mem. Supp. Def.'s Mot. Summ. J. [Docket 149], at 22.) The defendant then cites examples where courts have found that insurance claims adjusters' duties fall within the second requirement. *In re Farmers Ins. Exch.*, 466 F.3d 853, 859-64 (9th Cir. 2006); *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006); *Robinson-Smith v. Gov't Emps. Ins. Co.*, 323 F. Supp. 2d 12, 23 (D.D.C. 2004) (reversed and remanded by *Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886 (D.C. Cir. 2010)).

In response, the plaintiffs first argue that the defendant cannot meet the second prong because "Claims Examiners II and III have no supervisory responsibility and do not develop, review, evaluate, or recommend Sedgwick's business policies or strategies." (Mem. Supp. Pls.' Mot. Summ. J. [Docket 151], at 15.) In addition, the plaintiffs assert that the Claims Examiners' duties were not directly related to the management or business operations of Sedgwick because they were like production employees—"their job is to generate . . . the very product or service that the employer's business offers to the public (i.e., provide claims administration, managed care, program management and related services)." (*Id.* at 14.)

I recognize that in *Desmond v. PNGI Charles Town Gaming, L.L.C.*, the Fourth Circuit noted that the racing officials did not have supervisory responsibility and did not review or recommend Charles Town Gaming's business policies. 564 F.3d 688, 694 (4th Cir. 2009). To fulfill the second prong, however, it is not necessary that an employee supervise others or develop policies. The regulation states that to be exempt, the employee's primary duty must be "directly related to the management *or* general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2) (emphasis added). Supervisory authority and policy-making functions may demonstrate that an employee's duties are related to the management of an employer. But these responsibilities are not required for an employee's work

11

to relate to the general business operations of an employer or employer's customers.  *See In re Farmers Ins. Exch.*, 466 F.3d at 856 (finding claims adjusters exempt from the overtime provisions and noting that "[c]laims adjusters do not supervise other employees").  The numerous appellate decisions holding that insurance claims adjusters fall within the administrative exemption confirm that managerial duties are not necessary for an individual to qualify as an administrative employee.  *See, e.g.*, *Robinson-Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886, 888 (D.C. Cir. 2010); *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 867 (7th Cir. 2008); *In re Farmers Ins. Exch.*, 466 F.3d 835 at 856; *Cheatham v. Allstate Ins. Co.*, 465 F.3d at 584; *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 998 (8th Cir. 2003).

In addition, I do not accept the plaintiffs' contention that Claims Examiners are like production employees because they generate the product that Sedgwick offers to the public.  A similar argument was rejected by the Seventh Circuit in *Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865 (7th Cir. 2008).  The defendant in that case, CC Services ("CCS"), processed insurance claims for auto, home, commercial, and farm insurers.  *Id.* at 867-68.  The court explained that, "[t]he gist of the plaintiffs' argument is that CCS 'produces' claims-processing services (though not the underlying policies) and therefore [plaintiffs] are essentially responsible for 'producing' CCS's 'product.'"  *Id.* at 872.  The court stated that this argument depends on a distinction between in-house claims processing that is ancillary to the production of the policies and outsourced claims processing.  *Id.*; *see also Cheatham*, 465 F.3d at 585 ("An insurance company's product is its policies, and Appellants' duties did not include writing and selling insurance.").  The court pointed out that this distinction is immaterial because the administrative operations may be for the employer or the employer's customers.  *Roe-Midgett*, 512 F.3d at 872.  In *Roe-Midgett*, the court concluded that CCS's customers were in the business of selling

insurance policies and the plaintiffs performed an administrative function for CCS's customers by administering the policies. *Id.* Similarly, in this case, Sedgwick's customer, the State of West Virginia, provided workers' compensation insurance to claimants, and the plaintiffs administered these claims, rather than produced or sold a product. *See also Blue v. Chubb Grp.*, No. 03-C-6692, 2005 WL 1667794, at \*10 (N.D. Ill. July 13, 2005) ("[C]laims adjusters . . . . typically perform administrative duties."). Accordingly, I **FIND** that there is no genuine issue of material fact and the defendant has proven by clear and convincing evidence that the plaintiffs' primary duty directly related to the general business operations of Sedgwick's customer, the State of West Virginia.

> ii. Third Prong: Did the plaintiffs' primary duty include the exercise of discretion and independent judgment with respect to matters of significance?

Next, the plaintiffs argue that the defendant cannot prove that the plaintiffs' primary duty included the exercise of discretion and independent judgment with respect to matters of significance. In support of their position, the plaintiffs make the following factual assertions: (1) their duties were subject to strict guidelines and time frames; (2) the plaintiffs spent a significant portion of their day sorting the mail; and (3) White and Cunningham did not have authority to authorize medical treatments or settle claims, and they did not determine the initial compensability of claims. In contrast, the defendant contends that:

> [P]laintiffs exercised discretion and formulated unique independent judgments in (1) conducting an "individualized review" of the claim in order to determine whether requested medical care was related to a compensable injury; (2) assessing the value of claims when determining whether an appropriate reserve has been set, or when preparing an initial settlement proposal for their supervisor's approval; (3) interviewing and interacting with claimants, medical care providers, and attorneys; (4) creating "action plans" for each claim, in which the Plaintiffs analyzed the best course for bringing the claim to resolution; (5) making recommendations regarding litigation by directing the course of the litigation and reviewing legal bills; (6) engaging in other duties, including analyzing each claim for fraud and subrogation opportunities.

(Mem. Supp. Def.'s Mot. Summ. J. [Docket 149], at 27.)

I agree with the defendant that the undisputed facts show clearly and convincingly that the Claims Examiners' primary duty included the exercise of discretion and independent judgment. To see why, I provide a description of the aspects of the plaintiffs' positions that required discretion and independent judgment.

First, the plaintiffs processed claimants' requests for treatment and medication from their medical care providers. They determined whether the treatment or medication was related to a compensable injury and accordingly granted or denied it. Withrow said that she was able to authorize medication for up to ninety days. A West Virginia regulation requires that Claims Examiners subject certain treatments, such as surgeries, psychiatric treatment, and prescriptions for controlled substances, to utilization review before approving or denying the request. Utilization review is an assessment by a medical professional (either a utilization review nurse or third-party physician adviser) to determine whether the treatment is necessary. If a Claims Examiner was unsure whether treatment was related to the compensable injury, she could request input from a medical care provider or one of Sedgwick's utilization review nurses, even when utilization review was not required. According to McCormick, she communicated with physicians and nurses and reviewed medical reports to determine whether to approve requests for treatment. White indicated that she always met with a nurse prior to determining whether an injury was compensable. In some instances, the two would submit a request to White's supervisor and Barbara Brown, the Operations Manager for Sedgwick's Charleston office. If Griffith thought she should deny a claim, but was unsure, she would prepare the claimant's history and discuss the matter with her supervisor. At that point, the supervisor would make a determination or seek further input from a medical professional.

14

The process of approving or denying treatment involved discretion and independent judgment.  Specifically, the Claims Examiners first elicited information from the claimants and their doctors and then determined whether it was sufficient to demonstrate that a request was related to the injury.  The Claims Examiners also determined whether to subject the request to utilization review, as required by a West Virginia regulation.  The Claims Examiners did not always make these decisions alone, without the advice of supervisors or medical professionals.  This, however, does not negate the use of discretion and independent judgment.

Second, the plaintiffs were encouraged to promote the settlement of claims.[4]  If either the claimant or Claims Examiner thought a settlement was advisable, the Claims Examiner would speak to her supervisor to discuss whether to pursue settlement.  If the supervisor agreed that the claim was appropriate for settlement, the Claims Examiner formulated a settlement range that reflected the value of the claim, as measured by projected expenses.  Adkins explained the process for determining a settlement range:

> [Y]ou want to review the claim and the past history of it, how many surgeries did they have, are they taking any medication for it, how often do they see a physician for this injury.  You basically have to give a really good overview of that claim, and you want to calculate the cost of that claim per whatever their treatment is and how much it would cost to handle that treatment for, you know, the remainder of their life expectancy.

 (Def.'s Mot. Summ. J. [Docket 148-4], Ex. D, at 14-15.)  If the Claims Examiner's supervisor approved the settlement range, the Claims Examiner negotiated the settlement directly with the claimant or the claimant's attorney, and could settle anywhere within the range.  Withrow explained, as an example, that she "would have the authority to settle between six thousand and

---

[4] Since December 2010, Claims Examiners in Charleston are no longer responsible for creating settlement proposals or negotiating settlements.  Instead, Sedgwick has a settlement team that is in charge of these activities.  Webb is the only plaintiff who was employed by Sedgwick after December 2010, and remains an employee at Sedgwick.  Even though her position no longer requires her to work toward settling claims, she is still involved in setting reserves, approving or denying treatments and medications, and creating action plans, among other responsibilities.  I **FIND** that the defendant proved the third prong as applied to Webb's duties even after Webb was no longer involved in settlements.

ten thousand, so [she] could make that decision to settle for seventy-five hundred." (Def.'s Mot. Summ. J. [Docket 148-3], Ex. C, at 25.)  According to Giffith, Sedgwick provided training on how to effectively negotiate settlements.  If the claimant accepted, Withrow would prepare a settlement agreement, which was reviewed by her supervisor.  Clark would review the settlement agreement with the claimants: "[W]e would go down to read to make sure that they understood everything in there, they understood . . . the dollar amount and they understood what was going to happen afterwards . . . you had to explain everything to them."  (Def.'s Mot. Summ. J. [Docket 148-5], Ex. E, at 20.)

Withrow said that if her supervisor did not approve of the settlement range she formulated, the supervisor would give it back to Withrow with guidelines about what aspects of her calculations might have needed adjustment.  If a settlement range exceeded the authority of Withrow's supervisor and Barbara Brown, then Withrow would present the proposed settlement to a commission, including the West Virginia Insurance Commissioner and individuals from the Attorney General's office.  Griffith said that Brown also did an independent analysis of the claim and would do the majority of the speaking at the meeting with the commission.  Cunningham said that if the claimant demanded an amount higher than the settlement range, she would discuss it with her supervisor to determine whether the settlement offer could be increased.  Cunningham, however, only completed a few settlements.

Several aspects of the settlement process required discretion and independent judgment.  In formulating a proposed settlement range, the plaintiffs evaluated a number of factors and sought to create a range that could realistically facilitate settlement and be cost efficient for the State of West Virginia.  The plaintiffs then had to assess the best course of action for negotiating the settlement directly with the claimants.  In the event that a proposed settlement went before

the commission, the Claims Examiners were often required to make the presentation and answer questions about the settlement range.  These responsibilities required nuanced evaluations of the value of a claimant's injury and whether a settlement was possible and in the best interest of Sedgwick's client, the State of West Virginia, and the claimants.  *See Chubb Group*, 2005 WL 1667794, at *13 ("[Plaintiff] was responsible for negotiating settlements of her assigned claims.  This task required discretion and independent judgment.").

Claims Examiners were also responsible for the reserve set for each of their claims.  Adkins explained that, "a reserve for a claim is finances that are set up to carry the claim to duration to the best of your ability to calculate."  (Def.'s Mot. Summ. J. [Docket 148-4], Ex. D, at 21-22.)  The State of West Virginia reserves that amount to pay the costs of the claim.  Reserves contain different categories of expenses like physician visits and medication.  McCormick would examine the claimant's costs of medication in the past and assess whether they would be warranted in the future.  Clark would also consider factors such as the nature of the injury, life expectancy, and comorbidities, like diabetes and heart disease.  According to Brown, Claims Examiners II and III have the authority to set reserves up to $25,000 and $100,000 respectively without prior approval.  When one of the plaintiffs thought that the reserve should be adjusted based on activity or inactivity on the claim, she would recommend this to her supervisor and propose an updated reserve amount and the justification for the change.  Cunningham would look at, and if necessary, update the reserves on each of her claims once every six months.  Clark and Webb said that a reserve in a complex case could be over $1 million.  White explained that most of hers were set at hundreds of thousands of dollars.  When a reserve was high, the State of West Virginia might have intervened and asked the Claims Examiners to explain the amount of the reserve, and the Claims Examiners might have been

17

asked to recalculate it.  Once again, the plaintiffs' duties associated with setting reserves were not mechanical or repetitive like clerical work, which the regulations state does not involve discretion and independent judgment.  Instead, the plaintiffs evaluated a number of factors to set a reserve, using discretion and judgment in the process.

A claimant who is denied treatment or medication may bring suit contesting that denial. If litigation ensued, the Claims Examiners would interact with attorneys and ensure that they abided by a budget and a litigation plan.  Withrow recalls that when a claim entered litigation, she would prepare a legal referral letter, which set out the facts of the protest and explained the reasoning for denying the treatment or medication.  Sometimes an attorney would advise Withrow that a denial was not supported by the law.  In that case, Withrow would present this information to her supervisor as well as her own thoughts, and her supervisor would ultimately be responsible for deciding whether to reverse the decision.  According to White, she would not see a legal bill until litigation was over, and if she thought the bill looked too high then she would discuss it with her supervisor.  Webb said that sometimes an attorney would request a second medical opinion.  Webb would discuss the request with a group that may have included the supervisor of nursing and Brown.  Webb also explained that if an attorney did not like some aspect of the settlement agreement, Webb would present this information to her supervisor, without giving a recommendation.

The Claims Examiners had several other responsibilities.  They created action plans that outlined the strategy for closing a claim.  Cunningham said that it was best practice to update the action plan every three months, although sometimes she would update it more frequently if she thought that was necessary.  They also reviewed claims for fraud or subrogation opportunities. When fraud was suspected, Cunningham would meet with her supervisor to discuss the situation.

For example, Cunningham had a claimant who said she had carpal tunnel syndrome and could not use her hands.  Cunningham suspected fraud and had an investigator videotape the claimant, which revealed that she did use her hands.

Several of the plaintiffs explained that how they dealt with different parts of their job greatly depended on the facts and circumstances of each claim.  Adkins said, "Every claim is different."  (Def.'s Mot. Summ. J. [Docket 148-4], Ex. D, at 9.)  Clark echoed this sentiment in stating that, "Each claim was very different."  (Def.'s Mot. Summ. J. [Docket 148-5], Ex. E, at 15.)  They also expressed how varied their jobs could be from day-to-day.  For example, Adkins noted that "[Y]ou have no idea who you're going to talk to every day, how many times you'll talk to them, until you get the one issue resolved . . . . It just depends."  (Def.'s Mot. Summ. J. [Docket 148-4], Ex. D, at 20.)  These statements underscore my conclusion that the plaintiffs' primary duty included the exercise of discretion and independent judgment in executing the responsibilities outlined above.

Furthermore, the plaintiffs' exercise of discretion and independent judgment respected matters of significance.  The regulations explain that the level of importance or consequence of the work performed determine whether something is a matter of significance.  29 C.F.R. § 541.202(a).  The regulations then provide factors to consider, several of which apply to the plaintiffs.  29 C.F.R. § 541.202(b).  First, the reserves the plaintiffs set or recommended had a significant financial impact on the State of West Virginia because the State set aside that amount of money for the claim.  Clark and Webb recalled that reserves in complex cases could easily exceed $1 million.  Most of White's claims had reserves set at hundreds of thousands of dollars.  Moreover, the plaintiffs had the authority to negotiate and bind the State within settlement

ranges.  Finally, the plaintiffs' handling of claims that entered litigation were matters of significance.

I also note that the regulation states that "Insurance claims adjusters generally meet the duties requirements for the administrative exemption" if their duties include activities such as those enumerated in the regulation.  29 C.F.R. § 541.203(a).  The Claims Examiners performed several of the duties listed, including interviewing insureds and physicians; reviewing factual information to prepare damage estimates; determining the total value of a claim; and negotiating settlements.  Moreover, it is not necessary that the Claims Examiners performed all of the activities listed.  *See In re Farmers Ins. Exch.*, 466 F.3d 853, 861 (9th Cir. 2006) ("The regulation, however, does not require the adjuster to perform each and every activity listed.").

Now, I address the plaintiffs' arguments as to why their primary duty did not include the exercise of discretion and independent judgment.[5]  They first contend that they "were given specific tasks to complete as directed by Sedgwick and to complete said tasks within specific time frames."  (Pls.'s Mem. Supp. Mot. Summ. J. [Docket 151], at 7.)  This statement, however, is no more than a conclusory allegation.  The plaintiffs do not provide evidence of what those tasks were and how they fit into time frames.  Moreover, even if it were true that the plaintiffs worked under strict guidelines, this does not preclude the exercise of discretion and independent judgment.  *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 875 (7th Cir. 2008) ("[I]ndependent judgment is not foreclosed by the fact that an employee's work is performed in accordance with strict guidelines.");  *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th

---

[5] The plaintiffs attached as exhibits job descriptions for the Claims Examiner II, Claims Examiner III, and the Claims Supervisor.  The defendant asserts that these descriptions are not admissible.  The court need not determine whether they are admissible because even if the court were to consider them, they support the defendant's position rather than the plaintiffs'.  In particular, they support the position that the plaintiffs' primary duty included the use of discretion and independent judgment.  As an example, the description states that the Claims Examiner II should possess "[a]nalytical and interpretive skills," and its essential functions include assigning reserve values to claims, settling claims up to the designated authority level, developing and managing action plans, and approving disability claims and determining benefits due.  (Pls.' Mot. Summ. J. [Docket 150-1], Ex. A, at 1.)

Cir. 2003) ("Just because [plaintiff] was required to follow detailed manuals does not mean she did not exercise discretion and independent judgment.").

Next, the plaintiffs maintain that they spent a significant portion of their day sorting the mail. As support, the plaintiffs submitted, in response to the defendant's Motion for Summary Judgment, a recorded statement of Gloria J. Hensley, a former Claims Supervisor at Sedgwick. Hensley stated that the Claims Examiners were in charge of processing a great deal of mail. In their reply to the defendant's response to the plaintiffs' Motion for Summary Judgment, the plaintiffs attached an affidavit of Ms. Hensley that reiterated her position that the Claims Examiners processed a lot of mail. The reply also included an affidavit of Kenneth Pinnel, a former Claims Supervisor, which also discussed the Claims Examiners' responsibility for the mail. The defendant disputes the admissibility of Hensley's recorded statement because she did not lay a foundation of personal knowledge of the duties performed by the plaintiffs and she was not identified as a person with discoverable knowledge during disclosures.

As the Court of Appeals for the District of Columbia recently explained in *Robinson-Smith v. Government Employees Insurance Co.*, the regulations do not state how frequently discretion must be exercised. 590 F.3d at 894. In *Robinson-Smith*, the parties disputed how much discretion the adjusters exercised, but no one disputed that they exercised *some* discretion. *Id.* at 893-94. The court held that even if the "vast majority" of the adjusters' work was using their training and skills to determine the value of damage to vehicles, their primary duty also included the exercise of discretion and independent judgment because they were involved in the negotiation and settlement of claims. *Id.* Likewise, here the parties disagree as to how much time the plaintiffs spent exercising discretion and independent judgment, but the plaintiffs do not dispute that as part of their job they approved or denied treatments (sometimes with the guidance

of medical professionals), drew up settlement ranges, negotiated settlements, set and reevaluated reserves, created action plans, and could have assessed claims for possible fraud or subrogation opportunities.  Therefore, even if the "vast majority" of their work was consumed with tasks such as sorting the mail, the plaintiffs' primary duty nevertheless included the exercise of discretion and independent judgment.

Next, the plaintiffs emphasize that many of their decisions were subject to approval and review by their supervisors.  More specifically, in their briefing the plaintiffs assert that neither White nor Cunningham had authority to authorize medical treatments or settle claims.  In her deposition, White was asked whether she made determinations on requests for new treatments. She responded: "Once you went and had to meet with the nurse and if she felt that it was related, then you could go forward with it."  (Pls.' Mot. Summ. J. [Docket 150-4], Ex. D, at 4.)  Then, "depending on what it was, it might be something that just you and her could discuss and she could say yes.  And then if it wasn't, then you'd have to go to a supervisor."  (*Id.*)  With regard to settlements, White explained that, "your settlements had to be looked at before you could just go out and . . . negotiate."  (*Id.* at 5.)  To determine an appropriate settlement range to propose to her supervisor for approval, White explained, "you have to pull everything and look at their past medical history, look what their anticipated future medical needs are going to be, what they had to do."  (*Id.*)  Cunningham explained that she would discuss the direction of her claims with the nurses; in addition: "Authorizations would have to be sent to the nurse, like for surgery or testing, adding medications, that sort of thing."  (Pls.' Mot. Summ. J. [Docket 150-6], Ex. F, at 3.)  She then said, "We didn't have authority to authorize."  (*Id.*)  Cunningham also stated that she did not have a dollar amount that she could approve for settlement without first discussing it with her supervisors.  The plaintiffs also attach as an exhibit a portion of Adkins's deposition,

but do not cite any of her statements in their briefing.  Adkins emphasized in her deposition that, "everything I did pretty much had to be approved."  (Pls.' Mot. Summ. J. [Docket 150-5], Ex. E, at 2.)  The deposing counsel then stated, "Because . . . you were new," and Adkins responded, "Right."  (*Id.* at 2-3.)  Hensley also said that the Claims Examiners' "work can be changed or adjusted by a simple review by a supervisor, a nurse, or a doctor or anyone over top of them can look at their case work and say, this is what you should do."  (Pls.' Mem. Opp'n Def.'s Mot. Summ. J. [Docket 152-1], Ex. H, at 6.)

Once again, this is not fatal to the defendant's ability to meet its burden of proof.  It is not necessary that an employee's decision have finality that entails unlimited authority and an absence of review to fall within the administrative exemption.  29 C.F.R. § 541.202(c); *see also Talbert v. Am. Risk Ins. Co., Inc.*, 405 Fed. Appx. 848, 854 (5th Cir. 2010) (unpublished) ("The fact that [plaintiff] was not able to settle claims on his own, but had to seek approval from his supervisor, does not preclude his classification as an exempt administrative employee."); *Roe-Midgett*, 512 F.3d at 873.  Instead, the decisions that require discretion and independent judgment may be recommendations for action rather than taking action.  29 C.F.R. § 541.202(c).  In this case, some of the plaintiffs' decisions were recommendations, like the proposed settlement range.  In other instances, the plaintiffs' decisions were final.  For example, the plaintiffs could settle claims anywhere within the given settlement range, and the plaintiffs had the authority to set reserves up to $25,000 and $100,000.  Whether or not these actions were subject to approval or review, they undoubtedly required discretion and independent judgment.  In addition, the fact that the Claims Examiners did not make the initial compensability determination and in some instances subjected requests for treatment to utilization review is not sufficient to conclude that the plaintiffs did not exercise discretion and independent judgment.

*See Roe-Midgett*, 512 F.3d at 874 ("Unlike the claims adjusters in the opinion letters and cases we have cited, however, [plaintiffs] do not themselves determine coverage or liability.  They also do not negotiate with the claimant's attorney or make litigation recommendations.  We conclude that these distinctions are not significant enough to take the [plaintiffs] outside the scope of the administrative exemption.").

In conclusion, I **FIND** that there is no genuine issue of material fact and the defendant has proven by clear and convincing evidence that the plaintiffs' duties fell within the administrative exemption.  Accordingly, I **GRANT** summary judgment as to Count I of the plaintiff's complaint as it applies to the plaintiffs who were and are Claims Examiners.

## V.     The Fair Labor Standards Act and the Professional Exemption

The plaintiffs also allege in their Second Amended Complaint that Paula Ball was entitled to overtime pay.  The defendant asserts that her duties fell within the professional employee exemption.  Paula Ball has been a registered nurse since 2005.  Sedgwick hired Ball in 2008 as a utilization review nurse, and later she assumed additional duties as a telephonic case manager.  Ball would provide her medical opinion on treatment and medication.  In doing so, she would assess whether the requested treatment was related to the original compensable injury.  She also determined whether an issue should be referred for an independent medical evaluation.  As a telephonic case manager, Ball helped patients return to work, and she communicated directly with employers to address workplace accommodations.  She would also contact her patients at least every two weeks.  In addition to speaking with claimants about workplace issues, Ball discussed what they should expect from their condition and treatment.   Ball would sometimes act as a go-between for patients and their providers.

The defendant contends that Ball was a professional employee exempt from the overtime requirement.  29 U.S.C. § 213(a).  A professional employee is any employee:

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging, or other facilities; and

(2) Whose primary duty is the performance of work:
    (i)      Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or
    (ii)     Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor.

29 C.F.R. § 541.300(a).  The regulation further states that: "Registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption."  29 C.F.R. § 541.301(e)(2); *see also Mudgett v. Univ. of Pittsburgh Med. Ctr.*, No. 09-254, 2010 WL 1838413, at *2 (W.D. Pa. May 6, 2010); *Bongat v. Fairview Nursing Care Ctr., Inc.*, 341 F. Supp. 2d 181, 187 (E.D.N.Y. 2004).  The plaintiffs do not provide any argument in response to the defendant's Motion of Summary Judgment as to plaintiff Ball, and there is no dispute that she was compensated at least $455 per week.

The regulations support the defendant's position, but they are not dispositive on whether a particular nursing job has as its primary duty the performance of work requiring advanced knowledge.  *Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 39 (D.D.C. 2007).  The regulations elaborate that "work requiring advanced knowledge" is work that is "predominantly intellectual" and requires "the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work."  29 C.F.R. § 541.301(b). Applying this standard to Ms. Ball's duties, I **FIND** that her position at Sedgwick fell within the learned professional exemption.  As a utilization review nurse, she used her advanced knowledge to consistently exercise judgment in determining whether a treatment requested by a claimant

was related to the compensable injury.  Ms. Ball also used her discretion to decide whether a particular request required an independent medical evaluation.  Moreover, as a telephonic case manager, Ms. Ball's medical knowledge enabled her to examine claimants' conditions and provide advice on what to expect from treatments.  Accordingly, I **GRANT** the defendant's Motion for Summary Judgment as to Ms. Ball's FLSA claim.

## VI.     The Fair Labor Standards Act Collective Action Certification

Count II of the plaintiffs' complaint alleges a collective action claim against Sedgwick. 29 U.S.C. § 216(b).  Because the court grants the defendant's Motion for Summary Judgment as to the FLSA claims for all the plaintiffs, the plaintiffs' Motion for Conditional Certification and Court-Authorized Notice Pursuant to Section 216(b) of the FLSA [Docket 157] is **DENIED as moot.**

## VII.    The West Virginia Wage Payment and Collection Act

In Count III, the plaintiffs allege that Sedgwick violated the WVWPCA.  Although it is not entirely clear from the briefs, the court interprets the plaintiffs' argument to be that since the defendant was required to pay the plaintiffs overtime and they failed to do so, they correspondingly violated the WVWPCA because the plaintiffs were not paid the overtime they were entitled to within 72 hours.  W. VA. CODE § 21-5-4.  Because I granted the defendant's Motion for Summary Judgment as to the FLSA claim, the plaintiffs' state law claim likewise fails.  Accordingly, I **GRANT** the defendant's Motion for Summary Judgment as to the WVWPCA claim.

In conclusion, I **GRANT** the defendant's Motion for Summary Judgment as to all the claims and all the plaintiffs; I **DENY** the plaintiff's Motion for Summary Judgment and **DENY**

**as moot** the plaintiff's Motion for Conditional Certification and Court-Authorized Notice Pursuant to Section 216(b) of the FLSA.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.  The court **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:          January 25, 2012

Joseph R. Goodwin, Chief Judge